## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| NISSAN NORTH AMERICA, INC. ) | |
| ) | |
| Petitioner, ) | |
| ) | Case No. 01-C-1290 |
| vs. ) | |
| ) | |
| JIM M'LADY OLDSMOBILE, INC. d/b/a ) | Judge Joan B. Gottschall |
| JIM M'LADY NISSAN ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION AND ORDER

Nissan North America, Inc. ("Nissan") has sued one of its dealers, Jim M'Lady Oldsmobile, Inc. d/b/a Jim M'Lady Nissan ("M'Lady") to compel arbitration of a dispute regarding Nissan's termination of M'Lady's dealership. Currently before the court are Nissan's and M'Lady's cross motions for summary judgment, Nissan's asking the court to approve its petition to compel arbitration of the parties' termination dispute, and M'Lady's asking the court to deny Nissan's petition. In June 2003 Nissan filed a previous motion for summary judgment that was denied. *Nissan North America, Inc. v. Jim M'Lady Oldsmobile, Inc.*, No. 01 C 1290 (N.D. Ill. March 23, 2004) (the "March 2004 Order").

In the March 2004 Order, the court ruled that the issue of whether the parties' 1992 "Nissan Dealer Term Sales & Service Agreement," (including its four written Amendments, the "Dealer Agreement") had expired on May 1, 1999 (prior to when M'Lady filed its protest with the Illinois Motor Vehicle Review Board ("Board")), was a question of fact for jury determination. During pretrial conferences in chambers, however, it became apparent that the parties agreed as to the

1

operative facts and that this issue was actually a dispositive question of law. The court then requested the instant briefing on summary judgement.

Because the Dealer Agreement expired on May 1, 1999 according to its explicit terms and Nissan has not shown adequate reason to ignore this plain fact, Nissan's motion for summary judgement is denied and M'Lady's is granted.

## STANDARD

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In the consideration of a motion for summary judgment, the court must view the record and any inferences to be drawn from it in the light most favorable to the party opposing summary judgment. *See Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991). The party opposing summary judgment may not rest upon the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

## FACTUAL BACKGROUND

The court assumes familiarity with the March 2004 Order, including the detailed factual history it sets forth. A brief review of the facts follows.

By its most recent amendment, "Amendment No. 4," the Dealer Agreement has an expiration date of May 1, 1999. On April 14, 1999 Nissan sent M'Lady a written "notice of default" based on alleged breaches of the Dealer Agreement by M'Lady. The notice gave M'Lady sixty days to cure the alleged default. On June 25, 1999 Nissan informed M'Lady by letter that it would be willing to grant M'Lady a 180-day extension, until December 14, 1999 to correct its breach. The June 25, 1999

letter did not expressly offer to extend the Dealer Agreement, but only to forbear from forcing termination of the Dealer Agreement and pursuit of other remedies. After this December deadline passed, on January 19, 2000, Nissan sent another letter to M'Lady claiming to terminate M'Lady's dealership. Despite this, the parties continued to negotiate and over the following months Nissan offered several additional stays of its termination of M'Lady's dealership. For example, on May 8, 2000, during a period in which M'Lady had indicated to Nissan that M'Lady was considering selling the dealership, Nissan offered to stay the effective date of termination until July 14, 2000 to allow M'Lady to submit an asset transfer proposal acceptable to Nissan. Following this, on June 27, 2000, Nissan sent M'Lady a letter offering four separate proposals to govern the parties' future relationship. On July 6, 2000, M'Lady sent a letter to Nissan accepting one of Nissan's proposals.

On August 2, 2000, Nissan provided to M'Lady a proposed "Amendment No. 5" to the Dealer Agreement which, in addition to memorializing the proposal accepted by M'Lady on July 6, provided for an extension of the Dealer Agreement's term to January 8, 2001 and included an arbitration clause. M'Lady rejected this version of Amendment No. 5 and Nissan provided a revised draft that did not contain the arbitration provision. M'Lady also refused to execute this revised Amendment No. 5. On October 3, 2000, Nissan issued its final notice of termination of M'Lady's dealership and on October 20, 2000 M'Lady filed a protest of Nissan's termination with the Board.

**ANALYSIS**

The Federal Arbitration Act mandates that agreements to arbitrate must be in writing. 9 U.S.C. § 4. The only written agreement to arbitrate between the parties is found in the Dealer Agreement, with the arbitration clause contained in Amendment No. 4. Amendment No. 4 specifies an expiration date for the Dealer Agreement of May 1, 1999. Regardless of this stated date of

3

expiration, Nissan issued a final termination notice (the last of a series), purporting to terminate the Dealer Agreement on October 3, 2000, and M'Lady registered its protest with the Board on October 20, 2000. These facts indicate that M'Lady was within its rights to take its protest to the Board rather than to arbitration, since it appears that there was no written agreement to arbitrate extant on the date of M'Lady's protest to the Board.

In addition, a reading of the Dealer Agreement shows that it explicitly requires that amendments to its terms (including extensions of its duration) be written and signed by both parties.[1] Under California law where, as here, there is an express clause specifying that only written modifications are valid, that clause will be respected.[2] *Tomlinson v. Qualcomm, Inc.*, 97 Cal. App. 4th 934, 946n.15 (Cal. Ct. App. 2002) (express agreement specifying method of modification enforceable under California law); *see also Haggard v. Kimberly Quality Care, Inc.*, 39 Cal. App. 4th 508, 522 (Cal. Ct. App. 1995) (implied contract cannot modify agreement where parties agreed that modifications must be in writing).

The parties followed the Dealer Agreement's specified modification procedure in the past including with respect to extending the term of the Dealer Agreement - most recently when both Nissan and M'Lady signed Amendment No. 4 which extended the Dealer Agreement's term to May 1, 1999 from its prior expiration date of November 1, 1996. Nissan points out that the parties did

---

[1] The parties do not dispute that the Dealer Agreement contains the following clause: "This agreement contains the entire understanding of the parties hereto with respect to the subject matter contained herein and may be amended only by a written instrument executed by each of the parties . . . ."

[2] The Dealer Agreement specifies California law as controlling. The court notes, however, that M'Lady contests the application of California law to Nissan's extension theory. However, in granting M'Lady's motion for summary judgment, the court construes the facts against M'Lady as movant by applying California law as argued by Nissan.

4

not always follow this procedure - there was a gap in the written term of the Dealer Agreement between the November 1, 1996 expiration of the Dealer Agreement under its Amendment No. 1, and the May 18, 1998 signing of Amendment No. 4. Notwithstanding this gap, the fact remains that the parties did finally comply with the written-amendment requirement by executing Amendment No. 4.

Nissan advances two primary theories to overcome these adverse facts and argue that the Dealer Agreement did not expire prior to M'Lady's Board protest. One of Nissan's arguments is that it waived the expiration date of the Dealer Agreement several times, that these waivers were accepted by M'Lady, and that M'Lady consciously accepted benefits flowing from these waivers, thus extending the term of the Dealer Agreement.

Nissan's waiver argument fails. Waiver is the intentional relinquishment of a known right. *U.S. v. Olano*, 507 U.S. 725, 733 (1993). Nissan states in its response to M'Lady's motion that the right it claims to have waived was its "right to have the Dealer Agreement expire." Nissan sent its notice of default to M'Lady on April 14, 1999, which notice acknowledged that "[d]ealer's term agreement is now scheduled to expire in two weeks." Contrary to Nissan's assertion that the Dealer Agreement's expiration was subject to some unexplained right of Nissan, the expiration in fact occurred automatically.[3] Nissan also argues (voluminously in its response to M'Lady's summary judgment motion and much less extensively in its own summary judgment motion) that after its initial waiver of its "right" to have the Dealer Agreement expire, it repeatedly waived its right to

---

[3] The Dealer Agreement could not state that its expiration was automatic any more clearly: "This Agreement shall have a term . . . expiring on the expiration date indicated in the Final Article of this Agreement. Subject to other applicable provisions of this Agreement, this Agreement shall automatically terminate at the end of such stipulated term without any action by either Dealer or Seller."

terminate the Dealer Agreement due to M'Lady's alleged default. It is difficult to see how Nissan's decision not to terminate a contract that expired by its own terms approximately two weeks after Nissan's first notice of default constitutes a waiver of significant rights. After May 1, 1999, it had no "known right" to waive because the Dealer Agreement had expired. In this, the court is in accord with the Seventh Circuit, which noted that "a contract that by its own terms expired in 1999 [the Dealer Agreement] cannot possibly be the basis of the parties' current dealership arrangement, and thus the termination of the current relationship cannot, at least absent additional evidence, be said to relate in any way to the expired contract." *Nissan North America, Inc. v. Jim M'Lady Oldsmobile, Inc.*, 307 F.3d 601, 604 (7th Cir. 2002).

Nissan also argues that the parties entered into an implied contract to extend the term of the Dealer Agreement. This argument is better supported than Nissan's waiver argument, but still falls short. Citing *British Motor Car Distributors, Ltd. v. New Motor Vehicle Board*, 194 Cal. App.3d 81 (Cal. Ct. App. 1987); *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457 (9th Cir. 1999); *Kropfelder v. Snap-On Tools Corp.*, 859 F.Supp. 952 (D. Md. 1994); and *Sevicemaster Residential/Commercial Svcs., L.P. v. Westchester Cleaning Svcs., Inc.*, No. 01 Civ. 2229, 2001 U.S.Dist. LEXIS 4807 (S.D.N.Y. April 19, 2001), Nissan claims that the continuation of its business relationship with M'Lady after the expiration of their franchise agreement establishes that both parties impliedly agreed to extend the term of the written franchise agreement. Contrary to Nissan's argument, the mere fact that Nissan and M'Lady continued dealing with each other after May 1, 1999 in a fashion similar to their prior dealings does not in itself establish an implied agreement to extend the Dealer Agreement. To succeed on this argument, Nissan must show that Nissan and M'Lady's conduct conclusively evidenced their mutual assent to be bound by the Dealer Agreement (and not

some other agreement) for an extended term. *Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850-51 (Cal. Ct. App. 1999). They could instead have been operating under a new agreement, such as an oral franchising agreement, which is allowed by Illinois law.[4] 815 ILCS 710/2, § 2(i) (defining "franchise" as an oral or written arrangement between manufacturer and dealer.) The court notes that none of Nissan's cited cases deal with the situation here, where Nissan is claiming that an express modification-in-writing provision is trumped by an implied contract.

Nissan does supplement this "course of dealing" argument by arguing that in meetings between Nissan representatives and M'Lady, as well as in the series of letters Nissan sent to M'Lady between April 14, 1999 and October 3, 2000, Nissan extended several offers specifically to extend the term of the Dealer Agreement. Leaving aside for the moment the requirement that Nissan show that these offers were actually accepted, Nissan's argument fails because Nissan cannot show that it offered clear terms for M'Lady's acceptance.

Without clearly defined terms, there can be no implied contract, as the parties will not have had a meeting of the minds as to what they are supposedly agreeing to do. *Apablasa v. Merritt & Co.*, 176 Cal. App. 2d 719, 738 (Cal. Ct. App. 1959). The letters sent by Nissan to M'Lady contain much to indicate that Nissan itself was unclear as to the terms of the supposed implied contract to extend. For example, Nissan's October 3, 2000 letter to M'Lady purporting finally to terminate the Dealer Agreement begins by saying that the Dealer Agreement had already been terminated on January 19, 2000 because "you [M'Lady] materially breached the [Dealer] Agreement in a manner

---

[4] The court does not reach a determination of the nature of the agreement under which Nissan and M'Lady operated after the Dealer Agreement's expiration, as that determination is not necessary to decide the instant motions for summary judgment. The court mentions this possibility only to note that there are contracts besides the Dealer Agreement that could govern the current Nissan/M'lady relationship.

that warranted termination of your Agreement such that Nissan considers the Agreement rescinded." Nissan admits here that the Dealer Agreement ended at the latest in January 2000, which understanding is confirmed by reading Nissan's May 8, 2000 letter that refers to the January 19, 2000 notice of termination, and states that "Nissan considers the Agreement rescinded."

Nissan then makes contradictory statements in the October 3, 2000 letter as to the actual date of termination, stating first that "Nissan hereby gives Dealer [M'Lady] notice of its intent to terminate Dealer . . . effective thirty (30) days from Dealer's receipt of this Notice," ignoring the fact that it had said on prior occasions that the Dealer Agreement was already "rescinded." Immediately after making this statement Nissan confirms its earlier statement that it had actually terminated M'Lady in January 2000, "[p]lease be further advised that Dealer had a right to file a written protest with the Illinois Motor Vehicle Review Board within thirty (30) days of receipt on January 22, 2000 of Nissan's Notice of Termination dated January 19, 2000. Since Dealer has not filed any such written protest, Nissan refers to Dealer to and incorporates herein by reference Nissan's Termination Requirements set forth on Pages 3 and 4 in its Notice of Termination dated January 19, 2000." This is Nissan attempting to have its cake and eat it too - on one hand, it is notifying M'Lady that M'Lady's franchise with Nissan will be terminated as of the date of the letter, implying that it believes that the Dealer Agreement had been extended, but at the same time tries to cut off M'Lady's ability to protest to the Board by declaring the termination retroactive to the termination date first imposed by Nissan. This letter and others like it in the record do not support Nissan's need to show that the parties were mutually aware of the definite terms (such as the duration) of their supposed implied agreement to extend the Dealer Agreement. Additionally, most of the correspondence between Nissan and M'Lady does not even purport to offer extension of the Deal Agreement's term,

but instead merely contains offers by Nissan to refrain from early termination of the Dealer Agreement. The Seventh Circuit also noted this confusion, "[m]oreover, some of the letters to which Nissan points contain not offers to extend the contract term, but offers by Nissan to forbear early termination of the contract based on M'Lady's purported breaches." *Nissan North America*, 307 F.3d at 605.

Also damaging to Nissan's case is the fact that the parties actually attempted to negotiate a written extension of the Dealer Agreement, but failed to reach agreement as to the terms of this extension. In August and September 2000, the parties agree that they engaged in negotiations regarding the terms of an Amendment No. 5 which would have specified an extended term for the Dealer Agreement. The parties also agree that M'Lady refused to sign this extension. Furthermore, the parties agree that M'Lady rejected at least one draft of the proposed Amendment No. 5 because it contained an arbitration clause, indicating that M'Lady did not wish the Dealer Agreement as written (with its arbitration clause) to continue beyond its expiration. *See also Ri-Joyce, Inc. v. New Motor Vehicle Board*, 2 Cal. App. 4th 445, 454 (Cal. Ct. App. 1992) (where automobile franchise agreement specified that all modifications must be in writing signed by manufacturer and dealer, proposed amendment dealer refused to sign does not modify the agreement). Nissan further claims that M'Lady acknowledged its continuing obligations under the Dealer Agreement by telling Nissan that it intended to perform physical improvements that were described in Amendment No. 4. These indications of supposed assent to extending the Dealer Agreement are overshadowed, however, by M'Lady's refusal to execute a written extension to the Dealer Agreement. In so doing, M'Lady affirmatively rejected the opportunity to give substance to the parties' formerly amorphous "agreement" to extend the term of the Dealer Agreement.

## CONCLUSION

The Dealer Agreement establishes by its terms that it expired on May 1, 1999 and that it cannot be amended without a writing signed by both parties. Neither party has shown that there was a written extension of the Dealer Agreement's term, and Nissan has not shown that there was an implied contract between the parties or any other reason to ignore the Dealer Agreement's terms. As in *Haggard*, "[h]aving signed this clear and exclusive modification provision, plaintiff [petitioner Nissan] could not reasonably have relied on an alleged implied contract, which was not in a writing signed by the [parties], to modify the Agreement." 39 Cal. App. 4th at 521.

M'Lady's motion for summary judgement, denying Nissan's petition to compel arbitration is granted. Nissan's summary judgment motion on its petition to compel arbitration is denied.

    ENTER:

    /s/
    Joan B. Gottschall
    United States District Judge

Dated: March 4, 2005